IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

OHIO VALLY ENVIRONMENTAL
COALITION, INC., et al.,

      Plaintiffs,

v.           CIVIL  ACTION  NO.  2:12-3750

FOLA COAL COMPANY, LLC,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a motion by Defendant Fola Coal Company, LLC, for summary judgment. ECF No. 32. Also pending is a motion by Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., and Sierra Club ("Plaintiffs") for partial summary judgment and for declaratory and injunctive relief and civil penalties. ECF No. 34. For the reasons stated below, the Court **DENIES** Defendant's motion for summary judgment (ECF No. 32). Also, the Court **GRANTS in part** Plaintiffs' motion (ECF No. 34). Specifically, the Court **GRANTS** Plaintiffs' motion for partial summary judgment and for declaratory relief as to liability for all six Counts, but **holds in ABEYANCE** Plaintiffs' claims as to the number of violations and for injunctive relief and civil penalties.

**I.  Background**

Plaintiffs filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface

Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. Plaintiffs allege that Defendant violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia. Before proceeding to the parties' arguments, the Court will first discuss the relevant regulatory framework and then the factual background of this case.

**A. Regulatory Framework**

One primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the Act prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b). West Virginia received such approval of its state-run NPDES program in 1982. 47 Fed. Reg. 22363-01 (May 24, 1982). The State's NPDES program is currently administered through the West Virginia Department of Environmental Protection ("WVDEP").

All West Virginia NPDES permits incorporate by reference W. Va. Code R. § 47-30-5.1.f, which states in part that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [W. Va. Code R. § 47-2]."[1] States are required to adopt water quality standards in order to "protect the

---

[1] W. Va. Code R. § 47-30-5.1.f states in its entirety as follows: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, any activities covered

public health or welfare, [and] enhance the quality of water," and such water quality standards "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). Each standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id.*

In addition to being subject to the CWA, coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program pursuant to 30 U.S.C. § 1253. West Virginia received conditional approval of its state-run program in 1981. 46 Fed. Reg. 5915-01 (Jan. 21, 1981). The State's surface mining permit program is administered through the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code § 22-3-1 et seq. Regulations passed pursuant to the WVSCMRA require permittees to comply with the terms and conditions of their permits and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that "[d]ischarge from areas disturbed by surface mining shall not violate effluent

_____

under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11."

limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### B. Factual Background

This lawsuit involves four outfalls operated by Defendant as part of its mining activities in Clay County, West Virginia. Defendant holds WV/NPDES Permit WV1013815, which covers three of Defendant's mining areas: Surface Mine No. 4A (also subject to WVSCMRA Permit S200502), Cannel Coal Point Removal (also subject to WVSCMRA Permit S200605), and Cannel Coal Surface Mine (also subject to WVSCMRA Permit S200307). WV/NPDES Permit 1013815, ECF No. 34-1. Three outfalls discharge material from these operations: Outfall 022 (which discharges into Right Fork of Leatherwood Creek), Outfall 023 (which discharges into Rocklick Fork of Leatherwood Creek), and Outfall 027 (which discharges into Cannel Coal Hollow of Right Fork of Leatherwood Creek). Leatherwood Creek, in turn, empties into the Elk River.

Defendant also holds WV/NPDES Permit WV1017934, which regulates activities at Bullpen Fork Surface Mine. WV/NPDES Permit WV1017934, ECF No. 34-2. This mine is additionally subject to WVSCMRA Permit S200798. Outlet 009 discharges materials from this activity into Bullpen Fork, which in turn empties into Right Fork of Leatherwood Creek.

Both of these WV/NPDES permits require Defendant to monitor and limit the contents and characteristics of its discharges. For example, Defendant must monitor and report the pH of

4

its effluent. The permits set explicit effluent limits for certain pollutants, namely iron, manganese, and aluminum. Neither permit on its face identifies selenium as a pollutant whose presence must be monitored or limited. Both permits, however, incorporate by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, including § 47-30-5.1.f: "The discharge or discharges charges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [W. Va. Code R. § 47-2]. . . ." WV/NPDES Permit WV1013815 § C (noting that, among the terms and conditions incorporated by reference from the WV/NPDES Rules for Coal Mining and Facilities is § 47-30-5.1); WV/NPDES Permit WV1017934 § C (same). This incorporation by reference is in accordance with state rules, which require that the water quality standards rule— among other rules —"be incorporated into the WV/NPDES permits either expressly or by reference." W. Va. Code R. § 47-30-5.

West Virginia's water quality standards promulgated for the protection of aquatic life impose limitations on selenium. Specifically, selenium cannot exceed an acute limitation of 20 µg/l or a chronic limitation of 5 µg/l. W. Va. Code R. § 47-2, app. E, tbl.2, div. 8.27. The acute limitation is defined as a "[o]ne hour average concentration not to be exceeded more than once every three years on the average." *Id.* § 47-2-9 n.1. The chronic limitation is a "[f]our-day average concentration not to be exceeded more than once every three years on the average." *Id.* n.2.

Plaintiffs filed the pending Complaint against Defendant asserting six causes of action based on Defendant's alleged discharge of selenium from the four outfalls noted above and seeking declaratory, injunctive, and monetary relief. Plaintiffs allege that Defendant is in

violation of the CWA and Defendant's two WV/NPDES permits. Compl. Count I (as to WV/NPDES Permit WV1013815) & Count IV (as to WV/NPDES Permit WV1017934), ECF No. 1. Plaintiffs base these allegations on the assertion that § 47-30-5.1.f—which prohibits discharges that violate applicable water quality standards—is an enforceable "effluent standard or limitation" for purposes of the citizen suit provisions of the CWA. *See* 33 U.S.C. §§ 1365(a)(1) (describing requirements for CWA citizen suits), 1365(f) (defining "effluent standard or limitation").[2] Therefore, Plaintiffs argue, Defendant's discharge of selenium in excess of West Virginia's water quality standards is actionable under the CWA.

Plaintiffs also allege that Defendant is in violation of the SMCRA, the WVSCMRA, and its WVSCMRA permits. Compl. Count II (as to WVSCMRA permits S200502, S200605, and S200307) & Count V (as to WVSCMRA Permit S200798). These allegations are based on the allegation that the selenium water quality standard is an enforceable performance standard, and therefore, discharges in violation of the selenium water quality standard are actionable.

Lastly, Plaintiffs allege that Defendant is in violation of the SMCRA, the WVSCMRA, and its WVSCMRA permits based on its failure to install, operate, and maintain adequate treatment facilities as necessary to prevent discharges that violate state or federal law, namely

---

[2] 33 U.S.C. § 1365(f) defines "effluent standard or limitation" as follows: "For purposes of this section, the term 'effluent standard or limitation under this chapter' means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (7) a regulation under section 1345(d) of this title."

unlawful discharges of selenium. Compl. Count III (as to WVSCMRA Permits S200502, S200605, and S200307) & Count VI (as to WVSCMRA Permit S200798).

Each party has filed a motion for summary judgment in part or in full, and those motions have become ripe for resolution. The Court heard oral argument concerning the motions on November 6, 2013. Defendant moves for summary judgment in its favor on all of Plaintiffs' claims on the grounds that:

> (1) Fola's NPDES permits shield it from CWA enforcement actions, including citizens' suits, regarding discharges of pollutants that are not limited in its permits that were within the reasonable contemplation of WVDEP at the time the permits were issued, and (2) Plaintiffs cannot use SMCRA to circumvent the CWA's permit shield provision.

Def's Mot. Summ. J. at 2, ECF No. 32. Plaintiffs move for summary judgment as to liability for all six Counts and for other relief. Pls.' Mot. Part. Summ. J., ECF No. 34.

In Section II, the Court discusses the legal standard applicable to motions for summary judgment. Section III addresses Plaintiffs' standing to bring this lawsuit. Section IV discusses the parties' arguments concerning the scope of any applicable permit shield. Lastly, in Section V the Court analyzes whether the requirements of a citizen suit are met, namely, Plaintiffs' sixty days' notice to Defendant, whether Plaintiffs have shown violations of applicable law, and Plaintiffs' entitlement—if any—to certain relief.

## II. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Having discussed the standard for review of motions for summary judgment, the Court now turns to whether Plaintiffs have standing to bring this lawsuit.

### III.  Standing

Defendant argues that Plaintiffs lack standing to bring this lawsuit. Specifically,

Defendant claims that Plaintiffs cannot show an injury-in-fact and that the members whose alleged injuries form the basis of this suit neither use the receiving streams nor plan to use those areas in the future.

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000) (citation omitted); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *Ohio Valley Environmental Coalition, Inc. v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged

9

when deciding if standing exists. 808 F. Supp. 2d 868, 882 (S.D. W. Va. 2011) (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). Plaintiffs "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs seek to establish standing through two individual declarants: Cindy Rank and James Tawney. Both individuals allege that they are members of the Sierra Club, the West Virginia Highlands Conservancy, and the Ohio Valley Environmental Coalition. Defendant does not dispute Ms. Rank's or Mr. Tawney's membership in these organizations. Plaintiffs argue that

10

they have standing based on Ms. Rank's and Mr. Tawney's use of certain areas near the outfalls at issue in this case. To determine whether these declarants have suffered an injury in fact, the Court must first decide whether the areas used by these declarants are affected by Fola's discharges from the outfalls. Second, the Court will analyze the nature of the declarants' alleged injuries. Third, the Court will decide whether the organizational Plaintiffs have satisfied the standing requirements.

### A. Whether the Areas Used Are Affected Areas

The outfalls in this case discharge into: Right Fork of Leatherwood Creek of the Elk River; Rocklick Fork of Leatherwood Creek; Cannel Coal Hollow of Right Fork of Leatherwood Creek; and Bullpen Fork of Right Fork of Leatherwood Creek. Leatherwood Creek in turn flows into the Elk River.

Ms. Rank states that she began visiting the Elk River in the 1970s, and she has visited more recently. Decl. Cindy Rank ¶¶ 13, 18, ECF No. 34-12. She first visited Leatherwood Creek in 2003 or 2004, and has visited the mouth of Leatherwood Creek—that is, the area where Leatherwood Creek empties into the Elk River—multiple times. *Id.* ¶¶ 15, 17, 18. She also visited the Leatherwood Creek watershed on March 22, 2012, with Fola personnel and WVDEP inspectors. *Id.* ¶ 19.

Mr. Tawney first visited Leatherwood Creek as a child and previously fished at the Creek's mouth. Decl. James Tawney ¶¶ 8-9, ECF No. 34-13. Additionally, Mr. Tawney visits Sunset Cemetery (near Right Fork), where his stepmother is buried, at least once a year. *Id.* ¶ 13. He also participated in the inspection on March 22, 2012, visiting Bullpen Fork, Rocklick Fork, Right Fork, Cannel Coal Hollow, and Leatherwood Creek. *Id.* ¶ 15.

The Court notes that the areas visited by Ms. Rank and Mr. Tawney during the inspection on March 22, 2012, comprise all four of the water bodies into which the outfalls at issue directly discharge materials—that is, Bullpen Fork, Rocklick Fork, Right Fork, and Cannel Coal Hollow. Given that these water bodies directly receive pollutants from Defendant's activities and are contemplated as zones for monitoring pollutant levels, the Court has no trouble finding that Bullpen Fork, Rocklick Fork, Right Fork, and Cannel Coal Hollow are "affected areas."

Next, the Court considers whether Leatherwood Creek—all the way down to the Creek's mouth—and Sunset Cemetery are "affected areas." An employee of Appalachian Mountain Advocates stated that "[t]he distance between *the NPDES monitoring point* and the confluence of Leatherwood Creek and the Elk River is 4.48 stream miles." Aff. Emily Russell ¶ 8, ECF No. 50-4 (emphasis added). A map included with the affidavit shows that the NPDES monitoring point is located some distance away from the four outfalls. *Id.* app. A. Neither side provides a measurement of the distance between the outfalls and the NPDES monitoring point, but by the Court's estimate, this distance is approximately 1.5 miles. Additionally, the distance between Sunset Cemetery and Right Fork—the creek closest to the cemetery—is perhaps one-half or one-third of a mile, looking at that same map. This issue of distance is important because when determining proximity to polluting sources, the applicable measurement is the distance between the point used by the declarants and the *source of the pollution*, not the distance between the point of use and some other location, such as a measuring station. *See, e.g.*, *Laidlaw*, 528 U.S. at 183 (noting use of an area "approximately 40 miles downstream of the *Laidlaw facility*" (emphasis added)).

Plaintiffs present evidence of past pollution along Leatherwood Creek. Specifically, a

2010 WVDEP report noted that Leatherwood Creek's water was considered "impaired" based on its selenium concentration along the entire length of the Creek, which is a total of 11.3 stream miles long. WVDEP, *2010 W. Va. Integrated Water Quality Monitoring & Assessment Report*, supp. tbl.F, ECF No. 50-2. Also, Plaintiffs represent that selenium can travel at least 5.6 miles downstream. *See* WVDEP, *Selenium-Induced Developmental Effects Among Fishes in Select W. Va. Waters* 3-4 (Jan. 2010), ECF No. 50-5 (noting high levels of selenium in a certain reservoir due to surface mining); Decl. Derek O. Teaney ¶ 7, ECF No. 50-6 (noting that the nearest surface mining discharge point is 5.63 linear miles from that reservoir). This indicates that selenium can likely travel at least from the point of Defendant's operations to the mouth of Leatherwood Creek. This could also be taken as evidence that Defendant has polluted Leatherwood Creek in the past, although it is unclear if Defendant is the only company discharging material that could reach this Creek. Additionally, discharge influence can be expected where a monitoring station was placed in the tributaries receiving the Defendant's discharges flowing into Leatherwood Creek. After all, the monitoring station was placed in that location precisely to measure pollutant discharges from Defendant's surface mining.

The Court finds that the circumstantial evidence as a whole suggests that the mouth of Leatherwood Creek is an "affected area." Admittedly, the distance at issue here may be greater than that in *Ohio Valley Environmental Coalition, Inc., v. Marfork Coal Company, Inc.*, where the individual members used an area approximately 3.72 miles from the outfall at issue. No. 5:12-cv-1464, 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013). However, in other cases involving standing, the Supreme Court has found standing where the distance between the point of use and the facility was much greater than the possible distances here. *Laidlaw*, 528 U.S. at

13

183 (involving distance of 40 miles); *Gaston Copper II*, 629 F.3d 387 395 (involving a distance of 16.5 miles). Although those two cases did not explicitly involve selenium, they are instructive here in determining what sort of distance is reasonable for purposes of standing.

The declarants allege using areas along Leatherwood Creek, and have visited the tributaries which directly receive discharges from the outfalls. Although the exact distances involved are in doubt, the declarants' uses are certainly close enough to the sources of the pollution to find that the declarants "use the area affected by the challenged activity and not [merely] an area roughly 'in the vicinity' of it." *Lujan*, 504 U.S. at 566 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887-89 (1990)). *Compare with Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, 95 F.3d 358, 361 (5th Cir. 1996) (finding standing lacking when lake used was "located three tributaries and 18 miles 'downstream' from La Gloria's refinery"), *and Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 886-87 (use of lands "in the vicinity" of a 4500-acre tract of land was insufficient to show injury). Ms. Rank and Mr. Tawney have not alleged using areas well beyond the potential reach of Defendant's discharges, but rather, they use areas within the watershed affected by the discharges—an area that only spans a few miles. *See also Maple Coal*, 808 F. Supp. 2d at 883 (discussing how declarants' use of an area "within the zone of impact of any selenium discharge from the mine" was sufficient for standing purposes).

Therefore, taking into account all of the evidence regarding proximity, predictions of discharge influence, and past pollution, the Court finds that the area spanning from the outfalls to the mouth of Leatherwood Creek, including Sunset Cemetery, is affected by Defendant's discharges.

## B.  Declarants' Use of Affected Areas

14

Having determined that Leatherwood Creek, Sunset Cemetery, Right Fork, Cannel Coal Hollow, Bullpen Fork, and Rocklick Fork are affected areas, the Court now must determine whether a "direct nexus exist[s] between the plaintiffs and the area of environmental impairment." *Gaston Copper II*, 629 F.3d at 395 (citation omitted) (internal quotation marks omitted). Specifically, the Court must evaluate whether the individual declarants have demonstrated an actual injury.

Ms. Rank has been visiting Leatherwood Creek since 2003 or 2004. Rank Decl. ¶¶ 15, 17, 18. She "derive[s] great pleasure seeing birds and other wildlife enjoying the water and trees that shade much of Leatherwood [Creek] where it enters the Elk [River]." *Id.* ¶ 17. She clarifies, though, that she "enjoy[s] [her] travel and trips to the area much less knowing that selenium pollution exists," and she "fear[s] additional selenium pollution from the mines discharging into tributaries like Bullpen Fork . . . will bioaccumulate and become more toxic to the aquatic life in those streams and the Elk River itself." *Id.* ¶¶ 17, 18; *see also id.* ¶¶ 21, 23, 24 (explaining in more detail her concerns about pollution and environmental harm). When she visited the affected tributaries as part of the March 2012 citizen inspection, Ms. Rank "took pictures and enjoyed the sights and sounds of the creek," noting that "the stream itself is a delight to be near." *Id.* ¶ 19. Ms. Rank represents that she "will continue to visit the Elk River watershed at least once a year, Leatherwood and Buffalo Creek[s] in particular, and other tributaries in the area." *Id.* ¶ 25.

Mr. Tawney first visited Leatherwood Creek as a child, playing in the Creek during his father's softball games and catching crawdads and minnows. Tawney Decl. ¶ 8. He enjoys fishing and last fished at the mouth of Leatherwood Creek approximately eight or nine years ago. *Id.* ¶ 9. However, he "no longer fish[es] at that location because of [his] knowledge of pollution

15

from Fola's operation upstream. [He does not] want to waste [his] time fishing in polluted water." *Id.* He "would like to fish on Leatherwood Creek again and would be more likely to do so if there were no selenium in it." *Id.* ¶ 12. Additionally, Mr. Tawney visits Sunset Cemetery, where his stepmother is buried, at least once a year. *Id.* ¶ 13. He does not "stay as long as [he] would like . . . because [his] thoughts always turn to the damage that the Fola operations are bringing to the environment—including the selenium pollution in Leatherwood Creek." *Id.* He adds that "[i]t is insulting that the peaceful setting chosen for [his] stepmother's eternal rest is disturbed by the destruction of the environment in the area—including the pollution of the nearby streams." *Id.* When he participated in the citizen inspection in March 2012, Mr. Tawney "looked closely at the streams [they] visited, and got in some of them to turn over rocks to look for aquatic life, but no life was seen in the streams. [He] wanted to enjoy the streams, the sounds of the water, and being out in nature but was not able to fully enjoy them because of [his] concerns about selenium in the water and what it was doing to the things that live in the streams." *Id.* ¶ 15. In regard to future visits, he represents that he will visit Sunset Cemetery at least once a year and "will visit this area many times in the future." *Id.* ¶ 16.

As noted above, in the environmental context, an injury is sustained when "'the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run*, 268 F.3d at 263 (quoting *Sierra Club,* 405 U.S. at 735). It is clear that the aesthetic and recreational interests of Ms. Rank and Mr. Tawney have been lessened by the alleged pollution in the areas affected by Defendant's mining activities. Ms. Rank stated explicitly that she enjoys observing Leatherwood Creek and attempted to aesthetically enjoy the areas visited during the citizen inspection. Mr. Tawney has a long history of recreationally enjoying the affected areas, both by

16

playing as a child and by fishing as an adult. Additionally, he attempted to enjoy the areas into which the outfalls directly flow during the March 2012 citizen inspection. Perhaps most importantly for Mr. Tawney, he derives tremendous meaning from his visits to this stepmother's grave at Sunset Cemetery, but his enjoyment of the area is lessened by nearby pollution. It is clear that Ms. Rank and Mr. Tawney have a "direct nexus" to the affected areas.

In *Maple Coal*, this Court found standing to be lacking where the individual members first travelled to the outfall at issue for water monitoring trips and had no connection to the creek at issue prior to the visits. 808 F. Supp. 2d at 879-80. This Court noted that "the sole purpose of the water monitoring trips was to manufacture standing" and that the "connection is insufficient to make credible the contention that the person's future life will be less enjoyable as a result of Defendant's alleged exceedance of the selenium effluent limitations." *Id.* at 880 (internal quotation marks omitted). In this case, however, Ms. Rank and Mr. Tawney did not merely participate in the March 2012 inspection, but rather additionally attempted some sort of aesthetic appreciation and recreation beyond the scope of the visit. Rank Decl. ¶ 19 (noting that she took pictures and enjoyed the creek); Tawney Decl. ¶ 15 ("I wanted to enjoy the streams, the sounds of the water, and being out in nature but was not able to fully enjoy them because of my concerns about selenium in the water and what it was doing to the things that live in the streams."). The Court therefore makes it clear that although the inspection itself is not considered for standing purposes, the part of the visit that day that went beyond the scope of the inspection *does* weigh into the standing analysis. Furthermore, even if the Court were to discount the inspection *and* any recreational activities that occurred that day in their entirety, Ms. Rank and Mr. Tawney still have sufficiently alleged an injury traceable to Defendant's activities based on their connection

17

to and use of other areas as noted above.

Furthermore, Ms. Rank's and Mr. Tawney's plans to use the affected areas in the future are sufficiently concrete to show an actual or imminent injury. Mr. Tawney stated that he will visit Sunset Cemetery at least once a year, Tawney Decl. ¶ 16, and Ms. Rank stated that she "will continue to visit the Elk River watershed at least once a year, Leatherwood and Buffalo Creek[s] in particular, and other tributaries in the area." Rank Decl. ¶ 25. These are concrete plans rather than merely "'some day' intentions—without . . . any specification of *when* the some day will be." *Lujan*, 504 U.S. at 564. Therefore, the declarants' use of the affected areas shows an injury in fact that is traceable to Defendant's activities.

### C. Standing Met in This Case

Defendant also attacks Plaintiffs' standing on the grounds that Plaintiffs have submitted evidence of violations of water quality standards—rather than evidence of violations of effluent limits listed in the permit—in order to show an injury in fact. However, this argument goes more to the merits of one of Defendant's main arguments in favor of summary judgment—namely, that violation of water quality standards is not an enforceable requirement of Defendant's permits. Therefore, the Court will address that argument later. For purposes of standing, Plaintiffs have sufficiently alleged selenium pollution.

No other elements of the standing analysis are in question by the parties. The Court finds that the individual declarants satisfy the test for individual standing, and that the Plaintiff organizations satisfy the test for standing on behalf of the individual declarants. The Plaintiff organizations therefore have standing in this case. Having resolved the issue of standing, the Court now turns to whether the water quality standards provision is an enforceable effluent

18

limitation under Defendant's permits.

## IV.   Permit Shield Defense

Defendant argues that its WV/NPDES permits effectively "shield" it from liability for discharges of selenium because selenium is not a pollutant whose discharge is limited by the terms of the permit. As explained in Sub-Section A below, the Court rejects this argument and finds that the permit shield defense does not apply in this case. Defendant also argues that the water quality standards provision, W. Va. Code R. § 47-30-5.1.f, was never properly promulgated. In Sub-Section B, the Court explains why Defendant's collateral attack of its permits—specifically the incorporation of § 47-30-5.1.f into those permits—is both improper and untimely. Sub-Section C discusses how the original promulgation of § 47-30-5.1.f was most likely proper. In Sub-Section D, the Court analyzes how subsequent repromulgation cured any defect in the original promulgation.

### A.  The CWA Permit Shield and *Marfork*'s Effect

Section 402(k) of the CWA, known as the "permit shield," states:

> Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of [government enforcement actions] and [citizen suits], with sections 1311 [effluent limitations], [and] 1312 [water quality related effluent limitations] . . . of this title . . . .

33 U.S.C. § 1342(k). This Court examined the purposes of permit shields and the manner of determining the scope of any such shield in *Marfork*. 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013). In that case, defendant Marfork Coal Company argued that the permit shield defense protected it from liability for discharges of selenium because selenium was not a pollutant whose discharge was limited under the terms of its permit. In *Marfork*—just as in the instant case—the plaintiffs argued that the defendant's discharge of selenium violated applicable water quality

standards and that the water quality standards were an enforceable effluent limitation under the permit, even though the permit, on its face, did not mention selenium.

The Court found that the water quality standards provision in § 47-30-5.1.f resulted in an explicit, enforceable permit condition and that the permit shield defense therefore did not protect the defendant from liability for violations of water quality standards. To the extent that the parties' arguments in this case mirror those already resolved in *Marfork*, the Court finds that its decision in *Marfork* controls the resolution of those arguments. Although the WVDEP could have proposed to rewrite the rules to take out the water quality standards language if it believed that this provision was of no effect or should not to be included as a permit condition, it has not done so. Instead, the WVDEP has left § 47-30-5.1.f intact and continues to explicitly include it as a permit condition without alteration or limitation. Agency inaction is one factor here among others that points to the interpretation that the Court applies today. The Court will not revisit its decisions regarding those issues already resolved in *Marfork*, such as the effect of Senate Bill 615.

The parties in the instant case do, however, expand on some of the arguments presented in *Marfork* concerning the permit shield defense. Starting with Defendant's Reply, Defendant argues that § 47-30-5.1.f was not properly promulgated and is therefore unenforceable. The Court explores that argument below and ultimately finds that § 47-30-5.1.f is an explicit and enforceable condition of Defendant's WV/NPDES permits. Therefore, if Defendant violates this permit condition, it is not protected by the permit shield defense.

This Court clarifies that an alternative holding in *Marfork* does not apply in the present case. In *Marfork*, this Court found that the permit shield defense would not protect the defendant

even if the permit did not include the water quality standards condition. *Id.* at *17. The Court applied the reasoning of *Piney Run* in making this decision. In *Piney Run*, the Fourth Circuit found that if a pollutant is not explicitly limited by a permit condition, the discharges of that pollutant may be authorized in some circumstances. Specifically, certain discharges are implicitly authorized if they were disclosed and within the reasonable contemplation of the permitting authority at the time the permit was issued, because otherwise a permittee "would violate the terms of its NPDES permit . . . if it discharges an unlisted pollutant even at an infinitesimal amount." 268 F.3d at 271. When applying *Piney Run* in *Marfork*, this Court found that the amount of selenium discharged by the defendant was not within the reasonable contemplation of the WVDEP when the permit was issued and that the permit shield defense therefore would not apply even if the water quality standards provision was not an enforceable permit condition. *Marfork*, 2013 WL 4506175, at *17.

The parties in this case did not address whether Defendant properly disclosed information concerning its selenium discharges when applying for its WV/NPDES permits or whether selenium discharges were within the reasonable contemplation of the WVDEP when it decided to issue the permits. Therefore, *Piney Run* does not provide an alternative avenue by which Defendant could be found liable for its selenium discharges.

## B. Collateral Attack of Permits

Plaintiffs attack the timeliness of Defendant's arguments concerning the promulgation of § 47-30-5.1.f and its inclusion within the permits. If Defendant had concerns about any provisions in its permits, according to Plaintiffs, it should have taken action to correct those provisions much closer to the time when those permits were issued in 2008. This Court touched

21

on the issue of timeliness only briefly in *Marfork*, stating in passing that:

> WVDEP and/or its predecessor agency, the Department of Energy, promulgated rule § 47–30–5.1.f requiring compliance with water quality standards for coal mining operations. The state agency took the affirmative action to promulgate this rule, and the West Virginia Legislature also acted affirmatively to adopt it. WVDEP has also complied with the rule's directive that it be made a permit condition. This rule cannot now be interpreted such that it has no meaning.

2013 WL 4506175, at *15. It is necessary, however, to more fully discuss the issue of timeliness here.

Based on the CWA's terms, "it is well-settled that a NPDES permit holder may not challenge the validity of the permit in an enforcement proceeding." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 956 F. Supp. 588, 597 (D.S.C. 1997), *vacated on other grounds*, 149 F.3d 303 (4th Cir. 1998), *rev'd on other grounds*, 528 U.S. 167 (2000). If a permit-holder desires to attack the terms of an NPDES permit issued by the state permitting authority, it must bring an action challenging the terms of the permit under state procedures and cannot seek collateral review of the permit in federal court. *Id.* at 598 ("Defendant's remedy, if it believed that its . . . Permit was invalid for any reason, was to seek an administrative adjudication pursuant to [state] law. . . . Defendant never pursued this remedy."); *see also Gen. Motors Corp. v. EPA*, 168 F.3d 1377, 1382 (D.C. Cir. 1999) ("precluding collateral attacks ensures that the States [have] the opportunity as a threshold matter to address objections to the permits they issue" (citation omitted) (internal quotation marks omitted)).[3] Additionally, West Virginia law

---

[3] *See also Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 78 (3d Cir. 1990) ("Because [the defendant] never challenged the [biochemical oxygen demand and total suspended solids] limits in its permit until PIRG brought this enforcement action, it may not challenge them now. By failing to challenge a permit in an agency proceeding, [the defendant] has lost forever the right to do so, even though that action might eventually result in the imposition of severe civil or criminal penalties." (citation omitted) (internal quotation marks omitted)).

provides that a permit-holder may file an administrative appeal of his or her permit, but the permit-holder must file a notice of such appeal within 30 days of issuance of the permit. W. Va. Code § 22B-1-7(b)[4] & (c)[5]. Judicial review is provided for in § 22B-1-9.[6] Defendant did not seek such review of its permits, at least as it pertains to the water quality permit conditions.

Likewise, any challenge to the rule itself in this proceeding must be rejected. West Virginia's State Administrative Procedures Act ("APA"), which appears at W. Va. Code Chapter 29A, provides for declaratory judgments concerning the validity of a state rule:

> Any person, except the agency promulgating the rule, may have the validity of any rule determined by instituting an action for a declaratory judgment in the Circuit Court of Kanawha County, West Virginia, when it appears that the rule, or its threatened application, interferes with or impairs or threatens to interfere with or impair, the legal rights or privileges of the plaintiff or plaintiffs. The agency shall be made a party to the proceeding. The declaratory judgment may be rendered whether or not the plaintiff or plaintiffs has or have first requested the agency to pass upon the validity of the rule in question.

---

[4] "Any person authorized by statute to seek review of an order, permit or official action of the chief of air quality, the chief of water resources, the chief of waste management, the chief of mining and reclamation, the chief of oil and gas, or the secretary may appeal to the air quality board, the environmental quality board or the surface mine board, as appropriate, in accordance with this section." W. Va. Code § 22B-1-7(b).

[5] "An appeal filed with a board by a person subject to an order, permit or official action shall be perfected by filing a notice of appeal with the board within thirty days after the date upon which such order, permit or official action was received by such person as demonstrated by the date of receipt of registered or certified mail or of personal service." W. Va. Code § 22B-1-7(c).

[6] Federal law provides no mechanism in this proceeding for Defendant's challenge to a permit condition. The CWA provides that "interested persons" may challenge the EPA Administrator's actions "within 120 days from the date of such determination, approval, promulgation, issuance or denial [by the Administrator], or after such date only if such application is based solely on grounds which arose after such 120th day." 33 U.S.C. § 1369(b)(1). Furthermore, "[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement." *Id.* § 1369(b)(2).

23

W. Va. Code § 29A-4-2(a). That provision, however, does not provide a statute of limitations for bringing an action to challenge the promulgation of a state rule. Therefore, the general one-year statute of limitations found in W. Va. Code § 55-2-12(c) applies to a challenge brought against a West Virginia state agency for its promulgation of a state rule. W. Va. Code § 55-2-12(c) ("Every personal action for which no limitation is otherwise prescribed shall be brought . . . within one year next after the right to bring the same shall have accrued if it be for any other matter . . . .").[7] In contrast, a six-year statute of limitations applies to any suit against the federal government. 28 U.S.C. § 2401(a).

Of course, Defendant here has not brought suit against the WVDEP or any other entity for a declaratory judgment that the water quality standards provision cannot be included in its permits or enforced according to its literal terms. Rather, Defendant raises these arguments about promulgation and enforcement in defense to Plaintiffs' federal citizen suit. For the reasons explained above, Defendant is prohibited from collaterally attacking its WV/NPDES permits in this federal enforcement action.

Aside from the problem of collaterally attacking the WV/NPDES permits in this particular forum, Defendant's collateral attacks are also time-barred. The moment at which the statute of limitations for Defendant's arguments began to run depends in part on whether Defendant is raising a facial or an as-applied challenge. The Ninth Circuit discussed the differing standards applicable for these two sorts of challenges in *Wind River Mining Corporation v. United States*, 946 F.2d 710 (9th Cir. 1991). The Ninth Circuit found that the statute of

---

[7] *See also* W. Va. Code § 55-2-19: "Every statute of limitation, unless otherwise expressly provided shall apply to the State."

limitations for a facial challenge to a rule begins to run when the agency rule is promulgated. *Id.* at 715. This includes procedural or policy-based facial challenges. *Id.; see also Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012) ("When, as here, plaintiffs bring a facial challenge to an agency ruling . . . 'the limitations period begins to run when the agency publishes the regulation.'" (quoting *Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.,* 112 F.3d 1283, 1287 (5th Cir. 1997), and citing *Wind River*, 946 F.2d at 715)). For "a substantive challenge to an agency decision alleging lack of agency authority," the statute of limitations begins to run when the agency applies that decision to the challenger. *Wind River*, 946 F.2d at 716.

Defendant's arguments concerning invalid promulgation are procedural. Defendant does not appear to argue that an otherwise-valid provision is being applied to Defendant in some illegal way. Rather, Defendant argues that the rule was never properly adopted to begin with. Therefore, the statute of limitations would begin to run on any challenge to that provision when the rule was originally promulgated. In the instant case, the water quality standards provision became effective in 1985, nearly thirty years ago, which clearly falls well outside the applicable one-year statute of limitations. Even using the issuance dates of the state permits as the operative dates—both being issued in 2008—Defendant would be well outside the one-year statute of limitations. Assuming Defendant wanted to bring an action against the EPA arguing that its approval of the provision was procedurally invalid—which would be subject to a six-year statute of limitations—federal approval of the state program occurred in 1985, outside the applicable six-year period. Therefore, Defendant cannot raise a facial challenge to the water quality standards provision at this time.

Defendant argues, however, that the discovery rule applies to toll the applicable statute of limitations. Under the discovery rule, "the statute of limitations does not begin to run until plaintiffs discover, or reasonably should have discovered, all the elements of their claim." *Natural Res. Def. Council v. EPA*, 806 F. Supp. 1263, 1277 n.14 (E.D. Va. 1992). According to Defendant, "Plaintiffs offer nothing to explain how Fola could have or should have discovered— in 1984 or in any of the intervening years—that § 5.1.f imposed additional effluent limits in their permits and subjected them to additional liability for causing violations of water quality standards." Def.'s Resp. Pls.' Surreply at 12-13, ECF No. 56. At least one court within the Fourth Circuit has applied the discovery rule in the context of environmental cases. *NRDC*, 806 F. Supp. at 1277. In *NRDC v. EPA*, defendant EPA claimed that the NRDC was time-barred in challenging the EPA-approved dioxin-related water quality standards of two states, where the EPA first published a document about dioxin toxicity in 1984. The district court disagreed, finding that "the plaintiffs only knew of all essential facts of their claim when the EPA approved the Virginia and Maryland standards in 1990, not when the EPA issued its Criteria document in 1984. Applying a discovery rule as is appropriate in this case, this Court finds that plaintiffs are not barred by the statute of limitations." *Id.* at 1277.  The district court in the end held that the statute of limitations had not expired because that agency action was not yet reviewable. This reasoning has no application here.

The explicit language of Defendant's permits, imposing compliance with water quality standards, and of the rule requiring inclusion of the water quality provision in the permits precludes Defendant's reliance on any discovery rule. Given this language, the effect of § 47-30-5.1.f has been apparent from the issuance of the permits, even if no suit was brought until recent

26

years to enforce that provision.

While the WVDEP is in the process of considering modification of Defendant's permits to include selenium limitations, there is no indication that the EPA or WVDEP is engaging in some sort of formal review of the provision itself. Modification of the permit by the WVDEP is governed by the WV/NPDES rules:

> WV/NPDES permits may be modified, reissued, suspended, released or revoked either at the request of any interested person (including the permittee) or upon the [WVDEP] Secretary's initiative. However, permits may be modified, reissued, suspended, released or revoked only for the reasons specified in section 8 of this rule. All requests shall be submitted to the Secretary in writing and shall contain facts or reasons supporting the request. The Secretary may require additional information that may require submission of an updated permit application.

W. Va. Code R. § 47-30-8.1.a. Although there is no time limit for Defendant to seek modification of the permits by the WVDEP, the forum for such modification is the WVDEP, not this federal Court. Therefore, the WV/NPDES modification rules do not support collateral attack of the permits in this forum.

In summary, Defendant cannot collaterally attack the permits in this forum. Furthermore, even to the extent that any collateral attack was permissible, Defendant's collateral attack of the permits in court is time-barred.

### C. Original Promulgation

The parties and the Court engaged in a substantial discussion of whether the original promulgation of § 47-30-5.1.f was proper. Even though the Court need not reach the issue, the Court will address this topic next. West Virginia's version of the APA makes clear that a rule is only effective if it is properly promulgated: "[E]very rule and regulation (including any amendment of or rule to repeal any other rule) shall be promulgated by an agency only in

accordance with this article and *shall be and remain effective only to the extent that it has been or is promulgated in accordance with this article*." W. Va Code § 29A-3-1 (emphasis added). The original version of the water quality standards provision stated as follows:

> The effluent or effluents covered by this permit are to be of such quality so as not to cause violation of applicable water quality standards adopted by the State Water Resources Board. Further, any activities covered under this permit shall not lead to pollution of the groundwater of the state as a result of the disposal or discharge of such wastes covered herein.

W. Va. Code R. Art. 5A/NPDES Regulations, § 10E.01(f) (1984), ECF No. 47-2.[8] The Court finds that it is more likely than not that the promulgation of the original water quality standards provision was proper.

Defendant argues that this rule's requirement that discharges not violate applicable water quality standards is unenforceable because it was not properly approved under state or federal law. Def.'s Reply 2-8, ECF No. 47. Given the potential significance of this argument—first raised in Defendant's reply brief—the Court allowed Plaintiffs to file a surreply, Defendant to file a response to the surreply, and then each party to file an additional supplemental memorandum on the issue. The parties also spent significant time addressing this issue at oral argument on November 6, 2013. In researching this issue, the Court has examined publicly-available documents found on the website of the West Virginia Secretary of State.[9] After careful review of the legislative history of § 47-30-5.1.f and the parties' arguments, the Court finds that

---

[8]   "Approved" Proposed Regulations, Oct. 18, 1984, *available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=15239& Format=PDF.

[9] The Court notes that it may take judicial notice of and rely upon information not included in the pleadings which can be found via government websites, reports, etc. *See United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010).

28

the original promulgation of this rule was most likely done in a proper manner which made the rule enforceable.

Prior to 1984, the West Virginia Surface Coal Mining and Reclamation Act and the West Virginia Water Pollution Control Act were administered by separate entities. The WVDEP's NPDES permitting rules originally did not include language requiring a permit holder to comply with water quality standards. *See* W. Va. Code R. 20-5A, Series II (1981), ECF No. 47-1 (pre-1984 rules applicable to all WV/NPDES permits).[10] In 1984, the State's surface mining rules (under Article 6) and the water pollution control rules (under Article 5A) were consolidated as those rules related to coal facilities, and coal facilities were made subject to their own separate administrative permitting process, administered by the West Virginia Department of Natural Resources.[11] The revised version of the WV/NPDES rules for coal facilities proposed in October 1984 appears to include for the first time the requirement that discharges meet water quality standards:

> The effluent or effluents covered by this permit are to be of such quality so as not to cause violation of applicable water quality standards adopted by the State Water Resources Board. Further, any activities covered under this permit shall not lead to pollution of the groundwater of the state as a result of the disposal or discharge of such wastes covered herein.

W. Va. Code R. Art. 5A/NPDES Regulations, § 10E.01(f) (1984), ECF No. 47-2.[12]

---

[10] Particular attention is given to Section 5, Conditions Applicable to All Permits.  A more complete version is available at http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=22240&Format=PDF. These rules applied to all WV/NPDES permits issued for any and all industries or activities.

[11] *See* Proposed Art. 5A/NPDES Regulations, May 8, 1984, ECF No. 47-3.

[12] "Approved" Proposed Regulations, Oct. 18, 1984, *available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=15239& Format=PDF.

A review of the available, but limited, legislative history provides a plausible explanation of how this water quality standard requirement was inserted into the final version of the rules. Surface mining regulations placed in effect in August 1984—prior to the October and November 1984 versions[13] of the consolidated WV/NPDES rules—state that "[d]ischarge from the permit area shall not violate effluent limitations or cause a violation of water quality standards." Water Quality, § 6B.04(b).[14] It therefore appears to the Court that the language concerning water quality standards may have been inserted into the WV/NPDES rules so that those rules would be consistent with the state's surface mining regulations, which were already in effect. The existence of the earlier surface mining rules makes evident that compliance with water quality standards was already part of surface mining regulations at the time that the consolidated WV/NPDES rules were being drafted. Therefore, when consolidation occurred, the water quality standards requirement may have been placed into the final WV/NPDES rules to provide consistency with what was already required pursuant to state surface mining regulations, achieving one aspect of the goal of consolidation.

The Court believes that, although the water quality standards language was not in the earliest proposed version of the consolidation rules, its addition to the final consolidation rules was most likely proper, even if it was added later by the drafters. Although the consolidation was not a merger of *all* rules, the preamble to the proposed consolidated regulations explained at

---

[13] Nov. 8, 1984, ECF No. 64-1 (incomplete version).

[14] *Available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=6984&Format=PDF, at 69. Unfortunately, the title of the rule is omitted from this PDF, which is missing pages 1 through 4, making proper complete citation impossible.

length the extent of consolidation of the water pollution control program with the surface mining reclamation program. Preamble to Proposed Regulations Consolidating the Article 5A and Article 6 Program, ECF No. 64-1 at 2-5 (incomplete version).[15] The preamble explained the purposes of consolidation, which included the following: "[B]y consolidating the two programs, the Department [of Natural Resources] provides one-stop shopping for permits required under both the Water Pollution Control and the Surface Mining and Reclamation Acts." *Id.* at 2. The consolidation would increase administrative efficiency in that "the agency will need only one group of permit reviewers to examine the application for a facility, one set of regulations, and one enforcement group." *Id.* Additionally, "[c]onsolidation should provide benefits to the industry in the form of less paperwork, and consistent regulatory and enforcement signals from the agency." *Id.* The regulations "will consolidate the water pollution control program under Article 5A with the surface mining and reclamation program under Article 6." *Id.*[16] Furthermore, "permit reviews will be consolidated, thereby eliminating conflicting requirements which the two programs occasionally produce. Finally, the water pollution control provisions of Article 5A will be enforceable by the provisions of Article 6, as well as Article 5A." Preamble to Approved Regulations Consolidating the Article 5A and Article 6 Program, ECF No. 47-7.[17]

Therefore, although the addition of the water quality standards provision to the final language may have occurred later in the process, it certainly appears that interested parties were

---

[15] *Available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=15239&Format=PDF, at 2-10.

[16] *See also* Preamble to Approved Regulations Consolidating the Article 5A and Article 6 Program, ECF No. 47-7.

[17] *Available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=15239& Format=PDF, at 1-6.

put on notice of the purpose of the consolidation rules, given the emphasis in the earlier version on the goals of consolidation, not just of enforcement but of the programs themselves. *See* Attach. 1, Preamble to Approved Regulations Consolidating the Article 5A and Article 6 Program, ECF No. 47-7 at 7-27 (comments on and changes to proposed regulations).[18] The water quality standards provision was only one of the numerous provisions contained in the rewritten rules to effect the consolidation of water pollution control permitting with surface mining regulations. Numerous changes were made to the proposed rules as they moved through the rulemaking process, and the consolidation itself covered a wide range of issues. This was not a situation where the water quality standards language was the only alteration made; rather, it was one of many changes made to effectuate the overall goal of consolidation, a purpose known to all interested parties throughout the process. The addition of the water quality standards language did not change the basis or purpose of the revised regulations, that purpose being the consolidation itself.[19]

Defendant next argues that the EPA has never properly approved of § 47-30-5.1.f. The Code of Federal Regulations discusses EPA approval of revisions to a state's existing NPDES program:

---

[18] *Available at* http://apps.sos.wv.gov/adlaw/csr/readfile.aspx?DocId=15239& Format=PDF, at 27-47.

[19] Furthermore, the Court believes that the addition of the water quality standards language was a "logical outgrowth" of the earlier draft(s) of the consolidation rules. *See City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) ("'[A]n agency may issue rules that do not exactly coincide with the proposed rule so long as the final rule is the "logical outgrowth" of the proposed rule.'" (quoting *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991)); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-83 (D.C. Cir. 2009) (discussing and applying the "logical outgrowth" test).

> Whenever EPA determines that the proposed program revision is substantial, EPA shall issue public notice and provide an opportunity to comment for a period of at least 30 days. The public notice shall be mailed to interested persons and shall be published in the Federal Register and in enough of the largest newspapers in the State to provide Statewide coverage. The public notice shall summarize the proposed revisions and provide for the opportunity to request a public hearing. Such a hearing will be held if there is significant public interest based on requests received.

40 C.F.R. § 123.62(b)(2). The EPA's public notice regarding consolidation of surface mining and water pollution control for coal facilities in West Virginia appeared at 50 Fed. Reg. 2996-02 (Jan. 23, 1985). Defendant argues that this notice is ineffective because it "advised the public only that the State sought to consolidate within a single state agency NPDES permitting authority under the CWA and surface mine permitting authority under the Surface Mining Control and Reclamation Act" and did not provide notice regarding § 47-30-5.1.f being an enforceable permit condition. Def.'s Resp. Pls.' Surreply at 9.

This Court rejects Defendant's argument and finds that the EPA properly approved changes to West Virginia's NPDES program. As explained above, the public was properly on notice that the drafted version of the consolidation rules included the water quality standards provision. West Virginia's existing surface mining regulations already had such a requirement, and so the incorporation of that requirement into the consolidation rules provided consistency. Given the stated purpose of the consolidation, the EPA's notice in the Federal Register provided sufficient notice and opportunity for comment regarding the water quality standards provision as one aspect of the effect of consolidation. Therefore, Defendant's argument is rejected.

Ascertaining the intent and method behind the addition of the water quality standards language to the final version of the rules is challenging because nearly thirty years have passed and the administrative record regarding the regulations is far from complete. Given the

incomplete record before the Court and the lack of concrete evidence showing that the regulations were improperly promulgated, the Court will not now second-guess those regulations so long after their submission to the state rule-making process and approval by the state legislature. Although the Court cannot be certain why the water quality standards language was added, the Court finds that Defendant has failed to meet its burden of demonstrating that the rule should now be overturned as improperly promulgated.[20]

Defendant also argues that the incorporation of the water quality standards provision from the state's surface mining regulations into the state's water pollution control standards is an impermissible modification of the CWA. The Court rejects this argument. The enforceability of the water quality standards provision is not a modification of the CWA—rather, it is consistent with the CWA. Defendant claims that "[b]ecause Congress never intended that water quality standards be enforceable standards or limitations unless the permitting authority derived an actual end-of-pipe limit, any construction of W.Va. Code St. R. § 47-30-5.1.f to the contrary is outside the scope of the federal CWA and thereby not enforceable in a citizen suit." Def.'s Reply 12-13. To support this proposition, Defendant relies on the Second Circuit's holding in *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company*, 12 F.3d 353 (2d Cir. 1993). In *Atlantic States*, the Second Circuit held that "state regulations, including the provisions of [state pollutant discharge elimination system] permits, which mandate 'a greater scope of coverage

---

[20] If Defendant brought a direct challenge to the state agency action, it would have to show that "the rule violates constitutional provisions or exceeds the statutory authority or jurisdiction of the agency or was adopted without compliance with statutory rule-making procedures or is arbitrary or capricious . . . ." W. Va. Code § 29A-4-2(b); *see also* 5 U.S.C. § 706(2)(D) (a court can "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law").

than that required' by the federal CWA and its implementing regulations are not enforceable through a citizen suit under 33 U.S.C. § 1365." *Id.* at 359 (citing 40 C.F.R. § 123.1(i)(2)). That holding, however, has not been adopted in the Fourth Circuit and this Court rejects its reasoning. The Eleventh Circuit concluded that state law standards are incorporated into the CWA and are enforceable in citizen suits. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1006-08 & n.15 (11th Cir. 2004). The Eleventh Circuit in *Parker* stated that:

> [T]he citizen-suit provision of the CWA gives federal courts an independent basis of jurisdiction. The relevant question is whether a state standard enacted pursuant to the CWA is "an effluent standard or limitation under this chapter." 33 U.S.C. § 1365. On this question, the Supreme Court, although in dicta, has appeared to say yes, suggesting that citizens can sue under § 1365 regardless of whether the suit is based on standards promulgated by the EPA, or more stringent state standards that have received EPA approval. *E.P.A. v. California,* [426 U.S. 200, 224 (1976)].

*Id.* at 1006 n.15; *see also Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 988-89 (9th Cir. 1995) ("[N]othing in the language of the Clean Water Act, the legislative history, or the implementing regulations restricts citizens from enforcing the same conditions of a certificate or permit that a State may enforce." Also "[c]itizen suits to enforce water quality standards effectuate complementary provisions of the CWA and the underlying purpose of the statute as a whole."). Plaintiffs' citizen suit plainly falls within the ambit of 33 U.S.C. § 1365(a). A permit condition is enforceable as an "effluent standard or limitation" under § 1365(a).

Pursuant to the CWA, entities must follow "any more stringent limitation, including those necessary to meet water quality standards . . . established pursuant to any State law or regulations." 33 U.S.C. § 1311(b)(1)(C); *see also* 33 U.S.C. § 1313(e)(3)(A).[21] "The CWA

---

[21] "The Administrator shall approve any continuing planning process submitted to him under this section which will result in plans for all navigable waters within such State, which include, but are not limited to, the following: effluent limitations and schedules of compliance at least as stringent as those required by section 1311(b)(1), section 1311(b)(2), section 1316, and section

requires that 'every permit contain (1) effluent limitations that reflect the pollution reduction achievable by using technologically practicable controls and (2) any more stringent pollutant release limitations necessary for the waterway receiving the pollutant to meet "water quality standards."'" *Piney Run*, 268 F.3d at 265 (quoting *Am. Paper Inst. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993) (citing 33 U.S.C. § 1311(b)(1)(C))); *see also id.* at 259-62 (involving citizen suit for enforcement of state water quality standards).

All NPDES permits must comply "with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d). As explained by the Supreme Court, "[t]his regulation effectively incorporates into federal law those state-law standards the Agency reasonably determines to be 'applicable.' In such a situation, then, state water quality standards— promulgated by the States with substantial guidance from the EPA and approved by the Agency—are part of the federal law of water pollution control." *Arkansas v. Oklahoma*, 503 U.S. 91, 110 (1992) (footnote omitted). For the reasons explained above, Plaintiffs are permitted to use the CWA's citizen suit provisions to seek enforcement of state water quality standards. *See also Swartz v. Beach*, 229 F. Supp. 2d 1239, 1271 (D. Wyo. 2002) ("[W]hen state standards are incorporated into a NPDES permit . . . those standards are enforceable in a citizen suit under the CWA." (citing, among other cases, *Piney Run*)). The purpose of the state's water quality standards in this case is consistent the purpose of water quality standards under the CWA. The CWA allows enforcement of a state's permit water quality provisions, even when—as here—that standard may be stricter than federal standards.

---

1317 of this title, and at least as stringent as any requirements contained in any applicable water quality standard in effect under authority of this section[.]" 33 U.S.C. § 1313(e)(3)(A).

The Court also clarifies that Plaintiffs are not using the SMCRA to illegally circumvent the CWA's permit shield provision. The SMCRA states, "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing . . . [the CWA]." 30 U.S.C. § 1292(a)(3). As explained above, however, CWA's permit shield does not apply here to shield Defendant from liability. Therefore, this argument about circumventing the CWA is moot.

## D. Repromulgation

Even if the promulgation of the original version of § 47-30-5.1.f was improper for some reason, that defect has been cured by subsequent repromulgation. According to its promulgation history, the original version of § 47-30-5.1.f became effective on May 30, 1985.[22] An earlier version of § 47-30-5.1.f (numbered as § 47-30-5.1.6) required, in pertinent part, that "[t]he effluent or effluents covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards adopted by the State Water Resources Board." Notice, W. Va. Sec. of State, Admin. Law Div., ECF No. 53-3 at 8. On June 2, 1987, after the water quality provision became effective, the West Virginia Department of Natural Resources filed a notice of public hearing and comment period on a proposed rule, explaining in the preamble that it was making certain amendments to the WV/NPDES regulations for coal mining facilities (of which the water quality standards provision was part) "in order to conform with federal regulatory changes . . . related to coal mining facilities." *Id.* at 3. The proposal then gave a non-exhaustive list of proposed amendments. *Id.* ("Today's proposal includes the following amendments to Series 30[. . .]"). That list did not note any change to § 47-30-5.1.6. Later pages

---

[22] The West Virginia Code of State Rules lists the "Promulgation History" of Series 30, the WV/NPDES Rule for Coal Mining Facilities, as follows: "This rule originally became effective on the 30th day of May, 1985. Amendments to this rule were made effective on April 24, 1986, May 29, 1987, May 15, 1997, June 1, 2004, and July 1, 2009." W. Va. Code R. § 47-30-1.7.

37

included the full text of the provisions, with proposed deletions crossed out and proposed additions underlined. The water quality standard provision at § 47-30-5.1.6 was shown with the phrase "effluent or effluents" crossed out and replaced with "discharge or discharges." The subsequent Notice of Agency Approval of a Proposed Rule and Filing with the Legislative Rule-Making Committee noted this amendment in the same manner. ECF No. 53-4. Finally, the Notice of Final Filing and Adoption of a Legislative Rule Authorized by the West Virginia Legislature, dated April 1, 1988, reverted back to the "effluent or effluents" language. ECF No. 53-5. On July 17, 1996, the Office of Water Resources filed a notice of public hearing regarding further changes to the rule, proposing a change in the language of § 47-30-5.1.6 to remove reference to the State Water Resources Board and insert reference to the West Virginia Environmental Quality Board. ECF No. 53-6.[23]

Therefore, at least two of the revisions over the years involved direct changes to the water quality standards provision now renumbered at § 47-30-5.1.f. Although the 1987 notice did not specifically point to the changes being made to that section in a "short list" of proposed amendments, the longer text of the notice—where the provisions are written with proposed deletions and additions—clearly show that changes to the water quality standards provision were proposed. The 1987/1988 proposed amendments made it clear that the West Virginia Department of Natural Resources proposed to change the *very sentence* that prohibited violation of water quality standards. Certainly any interested party who was not yet aware of that provision would have had its attention drawn to it based upon the proposed amendments. The same is true for the 1996/1997 amendment. The Court therefore finds that the repromulgation of the rule cured any

---

[23] By that time, the rule included the phrase "discharge or discharges" rather than "effluent or effluents."

38

defect that may have existed in the earlier versions of the rule. In the instant case, even if the earlier notice-and-comment rulemaking was defective, this defect was cured by the repromulgations. The state agency repromulgations provided meaningful opportunity for interested parties to comment on the portion of § 47-30-5.1.f that is now under fire.

In summary, for the reasons stated above, W. Va. Code R. § 47-30-5.1.f is a valid rule and results in an explicit and enforceable condition of Defendant's WV/NPDES permits. Therefore, if Defendant violates this permit condition, it is not protected by the permit shield defense.

## V.  Requirements for Citizen Suit

Having determined that the permit shield is unavailable to Defendant and that the water quality standard for selenium is an enforceable effluent limit for the permits at issue in this case, the Court now turns to the issue of whether Plaintiffs are entitled to relief under the citizen suit provisions of the CWA and SMCRA.

### A.  Sixty Days' Notice

Under the CWA and SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). The notice must provide:

> sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (notice requirement for CWA citizen suit); *see also* 30 C.F.R. § 700.13(e)

(notice requirement for SMCRA citizen suit).[24] Providing such notice "is a mandatory condition

precedent to filing suit under [the CWA]." *Gaston Copper II*, 629 F.3d at 399 (citing *Hallstrom*

*v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989)). "Without adequate notice, the Court does not have

subject matter jurisdiction to hear the case." *Assateague Coastkeeper v. Alan & Kristin Hudson*

*Farm*, 727 F. Supp. 2d 433, 437 (D. Md. 2010) (citation omitted). The purpose of the notice is to

"allow a potential defendant to identify its own violations and bring itself into compliance

voluntarily," *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d

481, 488 (2d Cir. 2001) (citations omitted), and to "[allow] Government agencies the opportunity

to take responsibility to enforce the environmental regulations," *Assateague Coastkeeper*, 727 F.

Supp. 2d at 437 (citing *Hallstrom*, 493 U.S. at 29). Accordingly,

> [A]s long as a notice letter is reasonably specific as to the nature and time of the
> alleged violations, the plaintiff has fulfilled the notice requirement.  The letter
> does not need to describe every detail of every violation; it need only provide
> enough information that the defendant can identify and correct the problem.

*San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1155 (9th Cir. 2002). "The

sufficiency of the plaintiffs' notice letter must be assessed based on the facts that existed" at the

time notice was provided. *Gaston Copper II*, 629 F.3d at 401.

---

[24] (e) A person giving notice regarding an alleged violation shall state, to the extent known--
> (1) Sufficient information to identify the provision of the Act, regulation, order, or permit
> allegedly violated;
> (2) The act or omission alleged to constitute a violation;
> (3) The name, address, and telephone numbers of the person or persons responsible for
> the alleged violation;
> (4) The date, time, and location of the alleged violation;
> (5) The name, address, and telephone number of the person giving notice; and
> (6) The name, address, and telephone number of legal counsel, if any, of the person
> giving notice.

The parties do not dispute that Plaintiffs have satisfied their statutory obligation to provide sixty days' notice. Plaintiffs sent a letter postmarked May 25, 2012, in order to provide notice and then filed the pending Complaint on July 26, 2012, over sixty days later. Defendant concedes that this satisfies the sixty days' notice requirement. Def.'s Resp. Pls.' First Req. Admiss., Answer Req. No. 1, ECF No. 34-14.

## B. Evidence of Violations of Application Law

As explained above, Plaintiffs bring their claims against Defendant under the citizen suit provisions of the CWA and SMCRA. The CWA's citizen suit provision states that:

> [A]ny citizen may commence a civil action on his own behalf . . . (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a). Under the SMCRA's citizen suit provision:

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter . . . .

30 U.S.C. § 1270(a). The Supreme Court has interpreted the phrase "alleged to be in violation"—which appears in the CWA and SMCRA provisions above—to require "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987) ("*Gwaltney II*").[25]

---

[25] The *Gwaltney* line of cases is highly instructive for the Court's deliberations here. For the purposes of this case, it is useful for the Court to refer to four of the cases in this line: 1) the district court's original decision, 611 F. Supp. 1542 (E.D. Va. 1985) ("*Gwaltney I*"); 2) the Supreme Court's decision on appeal from the Fourth Circuit Court of Appeals, 484 U.S. 49 (1987) ("*Gwaltney II*"); 3) the Fourth Circuit's decision on remand from the Supreme Court, 844

### i. Good-Faith Allegation of Violation

"[A] good-faith allegation [of continuous or intermittent violation] . . . suffice[s] for jurisdictional purposes . . . ." *Gwaltney II*, 484 U.S. at 65. The issue of what evidence must be shown for jurisdictional purposes is distinct from what evidence must be shown for a defendant to ultimately be held liable for a violation of the CWA and SMCRA. *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171 (4th Cir. 1988) ("*Gwaltney III*") (on remand from the Supreme Court, drawing a distinction between "a good faith allegation of ongoing violation sufficient to maintain jurisdiction" and "prov[ing] their allegation of continuous or intermittent violations, as required in order to prevail"). The Supreme Court specifically rejected the proposition that "citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches." *Gwaltney II*, 484 U.S. at 64. Good-faith allegations, not definitive proof, suffice for jurisdictional purposes. *Id.* at 65. To meet the jurisdictional requirements, Plaintiffs must show that at the time they filed suit, they had a good-faith belief that Defendant was in continuous or intermittent violation of the CWA and SMCRA. In a jurisdictional sense, then, this good-faith belief is an element of Plaintiffs' claim.

Accordingly, the Court must consider what constitutes a sufficient good-faith belief for jurisdictional purposes. In the district court case which eventually gave rise to the Supreme Court's *Gwaltney II* decision, the Eastern District of Virginia considered this question:

> A useful analogy [for understanding good-faith belief] is the manner in which the federal courts treat the jurisdictional amount requirement in diversity cases. . . .

---

F.2d 170 (4th Cir. 1988) ("*Gwaltney III*"); and 4) the Fourth Circuit's decision on appeal again from the district court, 890 F.2d 690 (4th Cir. 1989) ("*Gwaltney IV*").

> In diversity cases, the question whether the jurisdictional amount is satisfied—and whether the court, ultimately, has jurisdiction—is not answered by whether the plaintiff ultimately recovers in excess of $10,000. Rather, the issue is whether the amount plaintiff *stated in the original claim* satisfies the amount, and is made in good faith. . . . [T]he test of good faith is whether it appears to be a "legal certainty" that the jurisdictional fact is not satisfied.

*Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 611 F. Supp. 1542, 1549 n.8 (E.D. Va. 1985) (emphasis in original) (citations omitted) ("*Gwaltney I*"), *aff'd,* 791 F.2d 304 (4th Cir. 1986), *vacated sub nom. on different grounds, Gwaltney II,* 484 U.S. 49 (1987). In *Gwantley I,* the district court found that "there was no certainty . . . —legal, factual, or otherwise—that [the defendant's] system would correct one of the two major violation problems for which this suit was brought—until nearly one year after the suit was filed." *Id.* at 1549 n.8. Therefore, the plaintiffs in that case had sufficiently pled a violation in good faith.

The Court finds here that Plaintiffs have sufficiently pled in good faith a continuous or intermittent violation of the CWA and SMCRA. In their Complaint, Plaintiffs allege that Discharge Monitoring Reports ("DMRs") submitted by Defendant show multiple violations of the acute and chronic selenium water quality standards from July 2008 to March 2012 in Cannel Coal Hollow, Leatherwood Creek, Right Fork, Cannel Coal Point Removal, and Cannel Coal Surface Mine. Compl. ¶ 52 & App. A. The Complaint also points to a WVDEP inspection on March 22, 2012, which shows selenium water quality standard violations at Bullpen Fork, Cannel Coal Hollow, Leatherwood Creek, Right Fork, and Rocklick Fork. *Id.* ¶ 54 & App. B.[26] Plaintiffs further allege that based on "Fola's pattern of violations . . . and the absence of any

---

[26] In their Complaint, Plaintiffs also cite to a WVDEP sample from on or about August 9, 2011, Compl. ¶ 53, but omit reference to this sample in their motion for summary judgment. Therefore, the Court will not consider that evidence.

evidence of any meaningful efforts by Fola to eradicate the cause of the violations . . . Fola is in continuing and/or intermittent violation of the Clean Water Act and SMCRA." *Id.* ¶ 57.

In the face of this evidence, the Court cannot find that it is "a 'legal certainty' that the jurisdictional fact is not satisfied." *Gwaltney I*, 611 F. Supp at 1549 n.8. In fact, quite the opposite appears to be true. The Court need not reach issues concerning sampling methodologies to make this finding; such analysis is not necessary to find that the jurisdictional element has been met. Having found that Plaintiffs have sufficiently pled in good faith a violation which confers jurisdiction, the Court now turns to whether in fact Plaintiffs have proven an actual violation of the CWA and SMCRA.

### ii. Whether Pre- or Post-Complaint Evidence is Required

The Fourth Circuit has explained the ways in which a plaintiff in a citizen suit can ultimately show the defendant to be liable under the CWA:

> Citizen-plaintiffs may [prove an ongoing violation] either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Gwaltney III*, 844 F.2d at 171-72; *see also Am. Canoe Ass'n v. Murphy Farms*, 412 F.3d 536, 539 (4th Cir. 2005) (applying the test).

Defendant argues that Plaintiffs must prove pre-Complaint violations in order for Defendant to ultimately be found liable for violations of the CWA and SMCRA, citing to *American Canoe* and this Court's ruling in *Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, LLC*, 723 F. Supp. 2d 886 (S.D. W. Va. 2010). *Gwaltney* and its progeny, as well as *American Canoe*, recite the two-prong test above, yet ultimately use the second-prong to find a

violation. *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693-95 (4th Cir. 1989) ("*Gwaltney IV*"); *Am. Canoe*, 412 F.3d at 539. This does not necessarily mean, however, that a plaintiff is foreclosed from solely using the first prong to prove an ongoing violation. Furthermore, this Court in *Hobet Mining* clearly found that the defendant was in violation of the CWA and SMCRA because the plaintiffs satisfied the *first prong*:

> A citizen-plaintiff can establish a continuing violation sufficient to warrant declaratory relief by proving either violations that occur on or after the date of the complaint, or a likelihood of the continued reoccurrence of intermittent or sporadic violations. *Gwaltney [III]*, 844 F.2d at 171–72. Here, Plaintiffs have satisfied the first prong of the *Gwaltney [III]* test. Plaintiffs submitted Defendant Hobet's October 2009 DMRs to the Court, on January 11, 2010, which show that Hobet was in violation of the selenium limits in WV/NPDES Permit 1022911 in October 2009. *See Pls.' Exhibits* (Doc. 24–1), App. A. These DMRs constitute binding admissions on the part of Hobet. *See Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1115 n. 8 (4th Cir. 1988) (DMRs are binding admissions that may be used to establish liability) *vacated on other grounds by Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 149 F.3d 303 (4th Cir. 1998). Thus, they are sufficient to establish that the company is in violation of the CWA and SMCRA.

*Hobet Mining*, 723 F. Supp. 2d at 923 (footnote omitted) (citations omitted).

Defendant points to a portion of *Hobet Mining* which states that "all that appears to be required is that the citizen group make a good-faith allegation that the defendant is in continuing violation of the CWA and SMCRA, and, *if such violation is established*, the company be held liable and injunctive relief imposed." *Id.* at 896 (emphasis added) (citations omitted). However, as explained above, a good-faith allegation of a continuing violation is not the same thing as proving the violation itself. "Such violation," as used in the excerpt, refers to a "continuing violation." Therefore, that sentence should be understood as stating that if a continuing violation is established, the company is liable for relief. And, as this Court made clear later in the *Hobet Mining* opinion, a continuing violation can be established by meeting just the first prong.

In *Marfork*, this Court noted that "Plaintiffs have cited both pre- and post-complaint measurements that provide a basis for the allegation that Marfork is causing a violation of the selenium water quality standard. The Court therefore finds that Plaintiffs have satisfied CWA's jurisdictional requirement." 2013 WL 4506175, at *19. This statement does not necessarily suggest, however, that pre-complaint violations are required to prevail. Rather, the Court was simply reciting the evidence of violations presented in the context of deciding whether this Court had jurisdiction in that case. The issue of whether the plaintiffs in that case had proven a CWA violation was discussed in the subsequent section and the Court made no finding in that section that pre-complaint violations would be required in order for the plaintiffs to prevail. Therefore, *Marfork* does not suggest that a plaintiff must prove pre-complaint violations in order to establish liability under the CWA.

This interpretation is supported by the Supreme Court's decision in *Gwaltney II*, where the Court stated that citizen suits under the CWA are meant to address present or future violations, rather than violations from the past. 484 U.S. at 59 ("the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past"). It would be inconsistent with the Supreme Court's clear statement about the forward-looking nature of citizen suits for this Court to require evidence of pre-complaint violations.

### iii.     *Evidence of Post-Complaint Violations*

Having determined that evidence of post-complaint violations can suffice to establish liability, the Court now turns to the specific evidence presented in this case. Plaintiffs requested entry for sampling pursuant to Federal Rule of Civil Procedure 34. Pls.' First Req. Permit Entry, ECF No. 40-3. This request was granted. During the inspection that followed, Plaintiffs sampled

various locations over six consecutive days—that is, from February 4 through 9, 2013. These six days comprise three discreet four-day periods: February 4 through 7; February 5 through 8; and February 6 through 9. Samples were taken on each of these six days from the four outfalls, in-stream points, and four monitoring stations. The four-day averages for selenium concentration at every sampling location, for each of these three discreet four-day periods, exceeded the chronic limitation of 5 µg/l. Selenium Concentrations, ECF No. 34-11.

The language of the regulations suggests that a one-hour average is required for each measurement. The notes accompanying the table listing selenium chronic and acute limitations state that the "[o]ne hour average concentration [is] not to be exceeded more than once every three years on the average, unless otherwise noted," and the "[f]our-day average concentration [is] not to be exceeded more than once every three years on the average, unless otherwise noted." W. Va. Code R. § 47-2, app. E, tbl.2, nn.1 & 2. This suggests that the four-day average is to be computed using one-hour averages.

There are two types of samples that could be used to measure effluent: composite samples and grab samples. They are defined as follows:

> 5.19.c. "Composite Sample" means a combination of individual samples obtained at regular intervals over a time period. Either the volume of each individual sample is proportional to discharge flow rates or the sampling interval (for constant volume samples) is proportional to the flow rates over the time period used to produce the composite. The maximum time period between individual samples shall be two (2) hours.

> 5.19.d. "Grab Sample" means an individual sample collected in less than fifteen (15) minutes.

W. Va. Code R. § 47-30-5.19.c & -5.19.d. Defendant argues that each sample must satisfy the durational component of being a one-hour average; it claims that although composite samples

satisfy this requirement, grab samples do not. Defendant argues that Plaintiffs must allege and ultimately prove this durational component, citing to a letter from the WVDEP. *See* WVDEP Letter to Office of Surface Mining Reclamation and Enforcement, July 29, 2013, ECF No. 40-2. That letter faulted a citizens' complaint for "assert[ing] selenium values above 5 micrograms per liter and below 20, but . . . fail[ing] to provide sufficient information to establish that their values held up over a four-day average." *Id.* at 8. Therefore, the complaint "failed to allege a violation of West Virginia water quality standards." *Id.* Nowhere does that letter specifically discuss durational components, however, other than to discuss calculation of a four-day average.

Applicable regulations and permit terms appear equivocal concerning what sort of sampling method is required. The actual permits do not specify what sampling method is required. "The Director may require that grab samples or composite samples be used for particular pollutants." W. Va. Code. R. § 47-10-4.4.b.7. However, the parties do not point to any precise statement as to what sort of sampling—composite or grab—is required for measuring the presence of selenium in effluent. Furthermore, the pleadings and oral argument suggest that Defendant finds the sampling method for pre-complaint violation to be problematic—but not necessarily for post-complaint violations. See Def.'s Resp. Pls.' Mot. Part. Summ. J. at 6, ECF No. 40; Tr. Pretrial Conf. at 72, Nov. 6, 2013.

The permits incorporate by reference the rule laid out in W. Va. Code R. § 47-30-5. This rule includes the water quality standard provision and the provisions regarding records of monitoring and DMRs found in § 47-30-5.11. These provisions include the requirement that "[s]amples and measurements taken for the purpose of monitoring shall be representative of the monitored activity." § 47-30-5.11.b. Furthermore, "[m]onitoring results shall be reported on

48

DMRs and at the intervals specified in the permit." § 47-30-5.11.e. As Plaintiffs point out—and Defendant does not refute—Defendant uses grab sampling when taking the measurements used in its DMRs. Therefore, Plaintiffs argue, it would be contradictory for grab samples to suffice as a "representative" methodology for DMRs but not for showing any discharge violations in citizen suits. This is made even more plain by the fact that DMRs have been used to show liability elsewhere. *Hobet Mining*, 723 F. Supp. 2d at 923 (finding that DMRs are "binding admissions" which can establish CWA and SMCRA violations).

To further refute Defendant's position, Plaintiffs cite to a 1997 Supplement to EPA's Guidelines for Preparation of the Comprehensive State Water Quality Assessments (305(b) Reports) and Electronic Updates. This document states that the "EPA believes that 4-day composites are not an absolute requirement for evaluating whether chronic criteria are being met." P. 3-18, ECF No. 50-1. The EPA website cautions, however, that the document is posted "for archival purposes only."[27] More current documents on the EPA website provide little—if any—insight into what sampling method is required. *See, e.g.*, Consolidated Assessment and Listing Methodology § 6.1, Jul. 2002 ("Effluent samples are *typically* collected as 24-hour composite samples . . . .") (emphasis added).[28]

Furthermore, Plaintiffs point out that the WVDEP, as noted in an Order to Defendant, found that samples taken during the March 2012 inspection showed selenium concentrations

---

[27] *See* http://water.epa.gov/type/watersheds/monitoring/guidelines.cfm. It should be noted that the document available via that page has the same title, but does not match the one presented by Plaintiffs.

[28] *Available at* http://water.epa.gov/type/watersheds/monitoring/upload/2003_07-24_monitoring_calm_calm_ch6.pdf.

which exceeded the selenium water quality standard and therefore ordered Defendant to apply for reissuance or modification of its permits. Order Issued Under Water Pollution Control Act, June, 5, 2012, ECF No. 34-8. The samples utilized in making these findings were grab samples.

The Court believes that grab samples are a sufficient sampling method for proving violations. In reaching this determination, the Court weighs heavily the fact that Defendant uses grab sampling when completing its own DMRs. Furthermore, the other evidence cited suggests that although other sampling methods may be preferred, grab samples are an acceptable method of sampling. The evidence presented by Plaintiffs from the Rule 34 inspection shows four-day averages in excess of the chronic selenium limitation at all four outfalls.[29] This post-complaint evidence shows that Defendant is in violation of the CWA and SMCRA.

Defendant concedes that no treatment facilities have been put in place for the selenium discharges at issue in this case. Therefore, the Court's finding as to liability applies to Counts III and VI as well. In summary, the Court finds that Defendant is liable as to all six Counts of Plaintiffs' Complaint.

## C. Entitlement to Relief

The Court is not in a position at this time to decide how many violations of the CWA and SMCRA have occurred or to impose any specific relief, including the injunctive relief requested by Plaintiffs. The Court will leave resolution of those issues to a subsequent time.

## VI. Conclusion

For the reasons explained above, the Court **DENIES** Defendant's motion for summary judgment (ECF No. 32). Also, the Court **GRANTS in part** Plaintiffs' motion (ECF No. 34).

---

[29] In making this determination, the Court need not reach the issue of whether a four-day average can be established using a sample from a single day.

Specifically, the Court **GRANTS** Plaintiffs' motion for partial summary judgment and for declaratory relief as to liability for all six Counts, but **holds in ABEYANCE** Plaintiffs' claims as to the number of violations and for injunctive relief and civil penalties.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        December 19, 2013

ROBERT C. CHAMBERS, CHIEF JUDGE