IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

OHIO VALLY ENVIRONMENTAL
COALITION, INC., et al.,

          Plaintiffs,

v.                                          CIVIL ACTION NO. 2:12-3750

FOLA COAL COMPANY, LLC,

          Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant's Motion for Partial Summary Judgment as to Phase II (ECF No. 76). For the reasons explained below, this Motion is **DENIED**.

**I.    Background**

Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., and Sierra Club ("Plaintiffs") filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. Plaintiffs allege that Defendant Fola Coal Company, LLC, violated these statutes by discharging excessive amounts of selenium into the waters of West Virginia from four outfalls operated by Defendant as part of its mining activities in Clay County, West Virginia: Outfalls 022, 023, and 027, as regulated by WV/NPDES Permit WV1013815; and Outfall 009, as regulated by WV/NPDES Permit WV1017934. At the time that this lawsuit was commenced, neither permit on

its face identified selenium as a pollutant whose presence must be monitored or limited. Both permits, however, incorporated by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, including § 47-30-5.1.f, which states, in pertinent part, "The discharge or discharges charges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [W. Va. Code R. § 47-2]." West Virginia's water quality standards promulgated for the protection of aquatic life impose an acute selenium limitation of 20 µg/l and a chronic selenium limitation of 5 µg/l. W. Va. Code R. § 47-2, app. E, tbl. 1, div. 8.27. The acute limitation is defined as a "[o]ne hour average concentration not to be exceeded more than once every three years on the average." *Id.* § 47-2-9 n.1. The chronic limitation is a "[f]our-day average concentration not to be exceeded more than once every three years on the average." *Id.* n.2.

Plaintiffs base the allegations in their Complaint on the assertion that § 47-30-5.1.f is an enforceable "effluent standard or limitation" for purposes of the citizen suit provisions of the CWA. *See* 33 U.S.C. §§ 1365(a)(1) (describing requirements for CWA citizen suits), 1365(f) (defining "effluent standard or limitation"). According to Plaintiffs, Defendant's discharge of selenium in excess of West Virginia's water quality standards is actionable under the CWA.

In a Memorandum Opinion and Order entered on December 19, 2013, ECF No. 70, this Court denied Defendant's motion for summary judgment, ECF No. 32, and granted in part Plaintiffs' motion for partial summary judgment, ECF No. 34, finding that Defendant was liable on all six Counts of Plaintiffs' Complaint. In so holding, the Court found that § 47-30-5.1.f was an explicit, enforceable permit condition, that Plaintiffs proffered evidence of post-complaint violations sufficient to establish violation of the CWA and the SMCRA, and that all other citizen

2

suit requirements were satisfied. The Court held Plaintiffs' motion in abeyance on the issue of the number of violations and the request for injunctive relief and civil penalties.

The Court subsequently directed the parties to file a Federal Rule of Civil Procedure 26(f) Report as to the nature of relief and remedies for Phase II of this matter, which the parties timely filed. The Report states, in part:

> Defendant intends to file a motion regarding mootness that, if granted, would obviate the need for some or all discovery for Phase II. Thus, the Parties have agreed upon and propose a briefing schedule and a hearing before the Court on Defendant's motion prior to the discovery deadlines.

Rule 26(f) Report at 1, ECF No. 72. The Court then denied the balance of Plaintiffs' motion for partial summary judgment because Plaintiffs' remaining claims would be resolved in Phase II. Order, ECF No. 75.

Defendant subsequently filed the pending Motion for Partial Summary Judgment as to Phase II. *See also* Mem. Supp. Mot. Part. Summ. J., ECF No. 77. In requesting partial summary judgment in its favor, Defendant notes that the two permits at issue in this case have been reissued to include selenium limits which go into effect in early 2016 for the four outfalls underlying this lawsuit and that the permits now include compliance schedules. Defendant argues that, based on these reissued permits, summary judgment should be granted in its favor as to injunctive relief, declaratory relief, and certain civil penalties. Plaintiffs filed an untimely Response, ECF No. 80, and Defendant filed a Reply, ECF No. 83. Defendant's Motion is now ripe for resolution.

Pursuant to a request by this Court, Plaintiffs and Defendant offered narrative explanations on Defendant's compliance to date with the terms of the reissued permit. On October 20, 2014, the parties offered brief oral arguments on the pending motion during a pre-trial conference. In Section II, the Court explains the standard of review applicable to motions for summary judgment. In

3

Section III, the Court discusses Plaintiffs' untimely Response. Lastly, in Count IV, the Court analyzes Defendant's arguments for partial summary judgment.

## II. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d

4

254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

### III. Plaintiffs' Untimely Response

The Scheduling Order entered regarding Phase II directs Plaintiffs to file a response to Defendant's motion regarding mootness by April 18, 2014. Sched. Order ¶ 1, ECF No. 73. However, Plaintiffs filed their Response on April 22, 2014—four days after that deadline—without having first sought leave from the Court to file that Response outside of time. Although Plaintiffs' failure could be grounds for not considering Plaintiffs' Response, the Court believes that the interests of justice are best served by considering the Response when resolving Defendant's Motion. However, the Court cautions Plaintiffs to be more mindful regarding deadlines and the rules for requesting extensions of time in the future.

### IV. Defendant's Motion for Partial Summary Judgment

First, the Court explores the parameters of the reissued permits in this case. Second, the Court discusses the effect of its recent decision in *OVEC, Inc. v. Alex Energy, Inc.*, No. 2:12-cv-3412, 2014 WL 1329919, at *1 (S.D. W. Va. Mar. 31, 2014). Third, the Court determines whether the reissued permits moot Plaintiffs' claims for declaratory and injunctive relief. Lastly, the Court considers whether the reissued permits moot Plaintiffs' claim for civil penalties.

#### A. The Reissued Permits

After the Court issued its Memorandum Opinion and Order granting partial summary judgment in favor of Plaintiffs on December 19, 2013, the West Virginia Department of Environmental Protection ("WVDEP") reissued the two permits at issue in this case. WV/NPDES

5

Permit WV1013815, which regulates discharges from Outfalls 022, 023, and 027, was amended to impose final effluent limitations for selenium, specifically a monthly average limitation of 4.7 µg/l and a daily maximum limitation of 8.2 µg/l. WV/NPDES Permit WV1013815 at 29, Jan. 17, 2014, ECF No. 76-1. The permit mandates that Defendant shall comply with these limits "[a]s soon as possible but no later than twenty-six (26) months after the effective date of the permit reissuance." *Id.* at 19. The permit's Rationale Page states that "[s]elenium effluent limits are being added to this permit due to high concentrations." *Id.* at 29. The reissued permit also includes a compliance schedule with a timeline for construction and operation of selenium treatment systems, *id.* at 19,[1] as well as present monitoring and reporting requirements for selenium, *id.* at 5, 6, 10.

WV/NPDES Permit WV1017934, which regulates discharges from Outfall 009, has been amended to similarly include a monthly average limitation of 4.7 µg/l and a daily maximum limitation of 8.2 µg/l, which goes into effect"[a]s soon as possible but no later than twenty-six (26) months after the effective date of the permit reissuance." WV/NPDES Permit WV1017934 at 13, 26, Feb. 28, 2014, ECF No. 76-2. Like the other reissued permit, this one also includes a compliance schedule with a timeline for construction and operation of selenium treatment systems. *Id.* at 13. The Rationale Page states that "sampling at Outlet 009 indicates compliance with selenium limitations may be difficult, therefore a compliance schedule of 26 months have [sic] been granted for Outlet 009." *Id.* at 26. The permit also includes present monitoring and reporting requirements for selenium. *Id.* at 9, 26.

---

[1] The Rationale Page states that the compliance schedule includes interim and final selenium limits, *id.* at 28, but the compliance schedule itself does not list interim selenium limits, *see id.* at 19.

6

B.  **Effect of** *Alex Energy*

Defendant argues that based on these reissued permits, summary judgment should be granted in its favor as to injunctive relief and declaratory relief and partially as to civil penalties. In support of its Motion, Defendant points to this Court's Memorandum Opinion and Order entered on March 31, 2014, in *Alex Energy*, in which this Court held:

> [T]he WVDEP is authorized to temporarily suspend the requirement that permit holders comply with water quality standards. Therefore, the holders of permits which impose present monitoring and reporting requirements for selenium and selenium limits that go into effect at a later date are not required to comply with water quality standards in the interim period between issuance of their permits and the effective date of the selenium limits.

2014 WL 1329919, at *1. In explaining why it arrived at this finding, the Court noted that "the future effective date for selenium compliance [in the permits at issue] create[d] an ambiguity—it could mean that [the permit holders] must comply with water quality standards in the interim or it could mean that [the permit holders] need not comply now as long as they meet the future limits." *Id.* at *8.

Plaintiffs argue that this Court's *Alex Energy* decision is "incorrect to the extent that it concludes that a permittee need not comply with all of its permit conditions when it receives a compliance schedule for a particular pollutant." Resp. at 2-3. In support of this argument, Plaintiffs claim that the existing water quality standards and the compliance schedules included in the reissued permits do not impose conflicting obligations and that compliance with the water quality standards is mandatory, citing West Virginia Code of State Rules § 47-30-6.2.o.1. That provision states:

> Any schedule of compliance shall require compliance as soon as possible, but in no case later than the applicable statutory deadline. In the case of permit conditions based on water quality standards established after July 1, 1977, a schedule of

7

>compliance may be used that shall assure that the discharge will not cause a violation of applicable water quality standards.

W. Va. Code R. § 47-30-6.2.o.1. However, the preamble to that subdivision expressly contemplates that a compliance schedule can be a tool for achieving future—rather than immediate—compliance with applicable standards. *See* W. Va. Code R. § 47-30-6.2.o. ("The permit may, when appropriate, specify a schedule of compliance *leading to compliance* with the CWA, Article 11, and rules promulgated thereunder." (emphasis added)).

Additionally, the Court interprets the provisions above in conjunction with Article 11 of Chapter 22 of the West Virginia Code, which states, in pertinent part, "All persons affected by rules establishing water quality standards and effluent limitations shall promptly comply therewith: *Provided,* That: . . . Where necessary and proper, the secretary may specify a reasonable time for persons not complying with such standards and limitations to comply therewith." W. Va. Code § 22–11–6(1). Read together, these provisions indicate that compliance schedules are meant to be tools that allow permit holders to eventually comply with applicable water quality standards on a fair timetable which may include temporary suspension of the water quality standards for that permit holder.

Plaintiffs also argue that this Court's holding from *Alex Energy* renders meaningless the permit condition which prohibits the violation of water quality standards and that because there is no conflict between the compliance schedule and that prohibition, it was incorrect to construe the permit conditions in the manner that occurred. Despite Plaintiffs' arguments, the Court stands by its earlier holdings. Interpreting applicable law to allow temporary suspension of the water quality standards does not render a permit's water quality standards provision meaningless. Rather, that standard would continue to apply if for some reason the compliance schedule did not exist. Also,

the Court did not find that there was a *conflict* between the water quality standards provision and the compliance schedules, but rather that there was an *ambiguity*. Again, "the future effective date for selenium compliance [in the permits at issue] create[d] an ambiguity—it could mean that [the permit holders] must comply with water quality standards in the interim or it could mean that [the permit holders] need not comply now as long as they meet the future limits." *Alex Energy*, 2014 WL 1329919, at *8. It was necessary for the Court to resolve this ambiguity, and the Court stands by its earlier resolution of this issue.

In summary, the Court rejects Plaintiffs' arguments that *Alex Energy* was incorrectly decided. Just as this Court held in *Alex Energy*, the WVDEP is authorized to temporarily suspend the requirement that permit holders comply with water quality standards. Therefore, the holders of permits which impose present monitoring and reporting requirements for selenium and selenium limits that go into effect at a later date are not required to comply with water quality standards in the interim period between issuance of their permits and the effective date of the selenium limits. For that reason, Defendant is not required to comply with water quality standards in the interim period between the reissuance of its two permits and the effective date of the future selenium limits found in those two permits.

### C. Whether Plaintiffs' Claims for Declaratory and Injunctive Relief are Moot

Plaintiffs argue that it would be premature to find at this time that its claims are moot, citing to this Court's statement in *Alex Energy* that it was "premature to rule at [that] time that Plaintiffs' claims for injunctive and declaratory relief are mooted." 2014 WL 1329919, at *18. However, the Court made that statement in the context of a Memorandum Opinion and Order resolving liability for selenium violations. Not only has liability already been resolved in the

9

instant case, but the parties—including Plaintiffs—expressly contemplated that the pending motion would be filed. *See* Rule 26(f) Report at 1 ("Defendant intends to file a motion regarding mootness that, if granted, would obviate the need for some or all discovery for Phase II. Thus, the Parties have agreed upon and propose a briefing schedule and a hearing before the Court on Defendant's motion prior to the discovery deadlines."). Ruling on Defendant's pending Motion at this time is proper.

Article III of the United State Constitution mandates that a court hear only continuing cases and controversies. *See United States v. Ala. S.S. Co.*, 253 U.S. 113, 116 (1920). "Simply stated, a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969). "The requisite personal interest that must exist at the commencement of litigation . . . must continue throughout its existence." *Id.* (ellipses in original) (quoting *Arizonans for Official English v. Arizoza*, 520 U.S. 43, 68 n.22 (1997)). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Decker v. NW Envtl. Def. Ctr.*, 133 S.Ct. 1326, 1335 (2013) (quoting *Knox v. Service Employees Int'l*, 132 S.Ct. 2277, 2287 (2012)). "If a case has been rendered moot, a federal court has no constitutional authority to resolve the issues that it presents." *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 525 (5th Cir. 2008).

The parties disagree about the applicable standard for determining whether Plaintiffs' claims for declaratory and injunctive relief are moot. Defendant argues that the more deferential "realistic prospect" test should apply, as discussed in *OVEC v. Hobet Mining, LLC* ("*Hobet I*"), No. 3:08-cv-0088, 2008 WL 5377799, at *6-7 (S.D. W. Va. Dec. 18, 2008). Under this standard, a

10

plaintiff's environmental claims are mooted by a defendant's subsequent actions to abate pollution unless there is a realistic prospect that the violations alleged by the plaintiff will nonetheless occur in the future. *Id.* at *7. The "realistic prospect" test contrasts with the less-deferential "absolutely clear" test that Plaintiffs argue applies in this case, under which a plaintiff's environmental claims are only mooted if "'it is *absolutely clear* the alleged wrong behavior could not reasonably be expected to recur.'" *Id.* at *6 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 46 (1987)). In *Hobet I*, this Court found that the "absolutely clear" test should apply in situations where a defendant had voluntarily stopped polluting, but that the more deferential "realistic prospect" test should apply in situations where a mandatory consent decree had been issued to resolve the underlying pollution concerns. *Id.* at *6-7.

Defendant further argues that no matter which standard applies, Plaintiffs' claims for injunctive and declaratory relief are mooted because there is no possibility that it could violate the water quality standards in the future:

> [O]nce a compliance schedule and future selenium limits are in place, the general provision requiring compliance with water quality standards is no longer operative. Since Fola's discharges of selenium can no longer violate this general condition in its permits, there is no unlawful conduct at issue in this case for the Court to enjoin.

Reply at 4. Additionally, Defendant argues that even if its pollution problems persist in the future, Plaintiffs cannot challenge those problems within this lawsuit, stating, "If Fola's discharges are not in compliance with the new final effluent limits on selenium at the expiration of the twenty-six month compliance schedule, Plaintiffs would need to file a new citizen suit alleging such violations." *Id.* at 5. Plaintiffs argue just the opposite—that their claims are not moot, regardless of which test applies. In support of this contention, they point to the WVDEP's poor record of

11

enforcement, the vague nature of the treatment plans, and the omission of any financial incentives for compliance under the permits' current terms.

The Court agrees that no matter the test applied, the reissued permits do not moot Plaintiffs' claims. All of the cases referred to by the parties consider the question of mootness *before* a court has made any findings with respect to liability, save one.[2] Here, liability has already been determined. While the reissued permits may ensure that there will not be future violations of the water quality standards, they do not erase the fact that this Court has already determined that Defendant did commit violations of the permit as it existed when the complaint was filed and as it existed when liability was determined.

"Once a citizen suit is brought and establishes a present violation, there is nothing in the [CWA] or in *Gwaltney* that prevents a court from ordering equitable relief to remedy the harm done in the past. Nor would it make policy sense to allow such a suit or remedy, if legitimate when brought, to be defeated by having the offender cease the violation as soon as the suit is filed while leaving the past harm unremedied." *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine*, 339 F.3d 23, 33 (1st Cir. 2003) (citations omitted).[3] So long as some remedy may be ordered related to

---

[2] Though mootness was determined following a determination of liability by the district court in *Incumaa*, the circumstances of the complaint and the relief sought are clearly distinguishable from the instant case and necessitated that result. In *Incumaa*, a prisoner housed in a maximum security unit ("MSU") challenged a state correctional policy barring MSU inmates from receiving publications via mail as a violation of his First Amendment rights. *Incumaa*, 507 F.3d at 282. The prisoner plaintiff styled his complaint as an as-applied challenge and sought declaratory and injunctive relief, but no money damages. *Id.* at 284. The Fourth Circuit dismissed the appeal of summary judgment in favor of the plaintiff as moot upon the plaintiff's relocation to another housing area shortly after the appeal was initiated. *Id.* at 285, 289. Because the plaintiff would only be again subject to the MSU policy as a result of his own conduct, his as-applied challenge to the policy was mooted upon his relocation. *Id.* at 289.

[3] Defendant argues that because injunctive relief is prospective in nature, any claim for injunctive relief is necessarily mooted if the wrongful conduct ceases. Like the court in *Atlantic Salmon*,

past violations, a live and justiciable controversy remains. *Decker*, 133 S.Ct. at 1335 ("[T]he cases remain live and justiciable, for the possibility of some remedy for a proven past violation is real and not remote." (citing *Gwaltney*, 484 U.S. 49)). While a court may determine that the relief sought is unwarranted on the facts of the case, that determination alone will not moot the case where the possibility of some remedy related to past violations remains. *Id.* at 1335–36.

The Court recognizes that, unrelated to, but occurring in the course of these proceedings, WVDEP transformed the nature of Defendant's duties under its permits. Moving forward, potential liability for excessive selenium discharges will not be governed by compliance with general water quality standards, but rather by more stringent effluent limits now specifically articulated in Defendant's permits. The reissued permits reflect recognition by WVDEP that specific numeric effluent limits for selenium are necessary to achieve state water quality standards. WVDEP further acted within its authority in setting out a compliance schedule that is reasonably calculated to lead to eventual compliance with these numeric effluent limits. That compliance schedule respects the unavoidable fact that designing, constructing, and operating an effective treatment system will take some time to accomplish.

The Court further notes that Defendant has taken concrete steps at considerable cost to comply with the terms of the reissued permits. Construction has commenced on schedule for the necessary treatment systems, and with the exception of an initial and arguably harmless delay, Defendant is complying with the newly imposed monitoring and reporting requirements. In sum,

---

however, this Court concludes that argument amounts to little more than a classic *non sequitur*. 339 F.3d at 33. As explained by that court, "[i]njunctive remedies for past harm commonly dictate future conduct so as to mitigate past harm. To say that the injunction looks to the future does not alter the fact that it is rooted in past violations, nor prevent its aims or its effects from being remedial." *Id.* (citation omitted).

13

the reissued permits are reasonably calculated to lead to compliance, and Defendant's conduct since their issuance suggests reasonable efforts toward eventual compliance.

Having found Defendant liable for the excessive discharges of selenium complained of, it is properly within the authority and discretion of the Court to next determine whether injunctive relief for past violations is warranted. While the reissued permits will be considered in this Court's analysis of whether injunctive relief is still appropriate, they do not moot Plaintiffs' request for injunctive relief. Whether the reissued permits and Defendant's efforts to eventually come into compliance amount to an adequate remedy for Defendant's violations is a question for trial.

### D. Whether Plaintiffs' Claim for Civil Penalties is Moot

"When considering whether a citizen suit has been mooted . . . , a court should consider injunctive relief separate from civil penalties." *Hobet I*, 2008 WL 5377799, at *7. Defendant argues that the Court cannot impose civil penalties for violations of the water quality standards that occur after the permits were reissued. In *Alex Energy*, this Court held that because defendants Highland and Bandmill had each been issued a compliance schedule, neither was "required to comply with water quality standards in the interim period between issuance of their permits and the effective date of the selenium limits." 2014 WL 1329919, at *1. Although Plaintiffs apparently concede this point, they also argue that Defendant's argument goes to the *amount* of the civil penalties that may be imposed, not the *mootness* of any civil penalties. Resp. at 17. The Court is inclined to agree with Plaintiffs that Defendant's argument does not go to the issue of mootness. The Court also agrees with the substance of Defendant's underlying point—that civil penalties should not be imposed for any water quality standards violations that occurred after the permits were reissued. The parties should keep in mind, however, that although civil penalties will not be

14

imposed for those violations, Defendant's practices after the permits were reissued could factor into the amount of the civil penalties imposed for violations of the water quality standards which occurred *before* the reissuances. *See* 33 U.S.C. § 1319(d) ("In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.").

## V.   Conclusion

For the reasons explained above, Defendant's Motion for Partial Summary Judgment as to Phase II is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: October 23, 2014

_____
ROBERT C. CHAMBERS, CHIEF JUDGE